and Immigration Services, USCIS, a branch of the U.S. Department of Homeland Security. Mr. Alko Wuha for the appellant, Mr. Kelly for the appellee. Good morning, and may it please the Court. Kweku Okoha, city of Austin, L.A. May it just a second? Jumping the gun here, I apologize. That's all right. Thank you. Anxious to go. Absolutely. All right. Thank you. If I may. May it please the Court. Kweku Okoha of Sidley, Austin, LLP for amicus Jeffrey T. Green of the same firm. We thank the Court for the opportunity to present argument this morning in support of Mr. Asemani, the appellant. The three strikes rule of the Prison Litigation Reform Act reflects two distinct statutory objectives. First, to limit baseless prison litigation, it constrains access to the court, and it does so by making prisoners who have had three cases dismissed on qualifying grounds ineligible for relief from standard filing fee requirements. Those who cannot pay cannot file. Second, and in some tension with the first, the Act facilitates access to the court for one class of prisoners, those who are under imminent danger of serious physical injury. They can file even if they have three strikes and no money to pay the fee. Mr. Asemani is one such prisoner. He has three strikes and he concedes as much, but he qualifies for the imminent danger exception if that exception is properly construed in light of the Act's twin objectives and constitutional avoidance principles. He timely invoked the exception by raising allegations of imminent danger once the government asserted that he had three strikes. Does it matter at all that the government's position is that now that he's in protective custody, he is no longer subject to the imminent danger he claims? Mr. Asemani explained in his opposition to the government's motion to revoke IFP status that, in fact, protective custody doesn't eliminate the danger that he was facing. It's not solitary confinement. He still interacts with other prisoners. He believes that in that setting he is still in danger. So I assume that protective custody does something. At least from the way the allegations are laid out in the pleadings, it looks like what happened is that he suffered a couple of assaults and he was placed in protective custody as a consequence of that, or at least in partial consequence of that. That's right. And so protective custody is not as if protective custody is the same situation he was facing before. He was put in protective custody precisely because he'd been assaulted. Exactly. It's not precisely the same situation, but as he explained, he in practice faces the same danger that are prisoners both inside and outside of protective custody, which is just a smaller unit of the prison who are inmate enemies, and so he's exposed to that danger there. In fact, this is now going to a point that is after he's filed the complaint, and so it wouldn't suffice in and of itself to establish he was in imminent danger at the time he filed his complaint, but just to sort of corroborate and establish the point. After he was placed in protective custody, and in fact after he filed his notice of appeal in this court, he was moved from protective custody into what's effectively solitary confinement because the prison officials in Maryland understood that there was a complaint that was arising in the protective custody setting that was so severe that protective custody was going to be insufficient to protect him. So the danger follows all the way through this prison environment, which is why the crux of his complaint is I need to get out of this medium-security facility into a minimum-security facility where I don't face these enemies. All right. Can I ask you this question? So if someone files a complaint that says the following, I'm under threat of assault. I can show that because I actually was assaulted a couple of times by other active security inmates. As a result of that, I was put in protective custody. And then the third, that's point two, and the third point is I continue to face a danger. Yes. Would you say that that makes out a claim of imminent danger? I would. He's making a claim that, yes, of course, the Maryland officials have done their job. They've been responsive. But their response, while helpful, hasn't eliminated the danger. That's the basis of the assertion of the imminent danger exception. So even though he gets put in protective custody, all he has to do is say, yeah, I was put in protective custody, and, yes, protective custody was done to alleviate the danger, but I'm still in danger. But it hasn't alleviated the danger, yes. I mean, this is a question that comes up in all pleading contexts. And the question is, well, does that make any sense? And I think he's explained that it does make sense. Protective custody, though protective to a degree, doesn't eliminate the danger because he has enemies both inside and outside of protective custody. Given that, the staff of the Maryland officials are helpful. It doesn't suffice to eliminate the danger and leaves him eligible for the imminent danger exception. But we do have some cases where individuals made the allegation that they were under duress and in danger. I take it the Court is thinking of the Mitchell case where he's been attacked 17 months before a filed complaint and didn't allege any ongoing danger. In contrast, Mr. Osamani clearly alleged ongoing danger and explained his understanding of why he's in ongoing danger. Mitchell must have alleged ongoing danger, at least in the sense that he was seeking to invoke the imminent danger exception. He's invoked the imminent danger exception in the sense of saying, I am entitled to file because of the imminent danger exception, but the Court was clear in its decision that, in fact, his allegations didn't point to any ongoing danger. The other case along those lines is Pinson, where Mr. Pinson's claim was, I'm a person with characteristics that puts me in danger in the foreign supermax because it's known to be a danger for people who have cooperated with the government and are homosexual. But what the Court said there is that all he's done is present sort of generalized allegations that this place is dangerous. Mr. Osamani, in contrast, has presented allegations that point to why this prison for him is specifically dangerous. I think that's the distinction. So then you accept the proposition that generalized allegations that a situation is dangerous aren't enough, even though they do say, I'm in danger. Absolutely. Absolutely. I think the thought of effectively the whole thing of Pinson, a pure claim of prisons are dangerous or even this prison is a dangerous kind of place wouldn't suffice. I think the Court would then need to, the prisoner would have to say why that prison for him in a particular context is dangerous, and that's what, that's the burden, and I think that's the burden that Mr. Osamani has met by pointing to the reasons why both outside and inside protective custody, Western Correctional Facility is dangerous for him. So if there was evidence of imminent danger and the correctional officials moved the prisoner to what the correctional officials think is a more protective status, is there any burden to show imminent danger in that status beyond saying my enemies are still at the prison? Well, I think saying that my enemies are here in a specific and cogent way I think is important. It wouldn't be enough to say. I'm just wondering what the limit to that is. Sure. Given correctional environments. Sure. I mean, I'm not sure I can provide a better answer than the District Court would have to look on a case-by-case basis. So even there is no burden, even where his correctional status has changed in an effort to provide him protection, there is no burden beyond pointing to the imminence that he suffered in his previous status? That's not our position. Our position, and I hope I can be clear about this, is that if he's been moved to a second facility, effectively his burden is the same as it was in the first facility. So in a case where a prisoner hasn't been moved at all, his burden is to show, through those specific and concrete allegations, that he's subject to ongoing danger in Facility A. If he's been moved to Facility B, he'll need to make the same showing as to Facility B. So then how do you draw a distinction with Pinson? Because, for example, in Pinson the allegation was that I'm in a facility, and this facility is known to be hostile to homosexual inmates. That's right. And he obviously, the implication of that is that he's homosexual, and therefore he's in danger. And here the allegation is I'm in a status protective custody, and I'm in danger because I have enemies. People don't like me. Which is the same thing as saying people don't like me because of my sexual orientation. There are some similarities. I'll agree. I think the distinction is that Mr. Asamani is pointing to personal facts, establishing that he personally has these enemies, that the fact that he's a target is known to the people who attack him, and I don't think Mr. Pinson said... What could he have said? Because he's made the allegation that I'm homosexual in this facility. People don't like homosexuals. I think he was missing one step, which was to explain how that danger is likely to materialize other than in a very generalized sense, so that this group of people are coming after me because of my personal characteristic. And as shown by an instance on December 1st and December 15th and December 30th, I trust would have qualified. I take your point that when you've alleged specific incidents, that raises the degree to which you're stating a claim for imminent dangerousness. But then I think what Judge Rod was pointing out is that claims of particular incidents here predated the move to protective custody. That's correct. That's correct. And so there I think all that he can really do is say, well, look, the sword of Damocles is still hanging. It would be, respectfully, I think it would be a pretty pernicious understanding of the rule if it required him to show that now I've been attacked again before he could raise the... Oh, he definitely wouldn't. No one would say that he needed to be attacked again, obviously. I think the question is at what degree of specificity do you need to make allegations that notwithstanding the move to protective custody, the danger remains? Right. And I think it's essentially to explain, as he did, here's why the move doesn't address the danger. Can I ask you one question if we move on from the question of dangerousness? Now, let's suppose, and I know you disagree with this, but let's suppose that he can't make out the showing of him in dangerousness. So then we get to the question of whether there's a constitutional problem with applying the three-strike provision against him. Yes. And so there's a lot of law, the Supreme Court's decision in MLB, et cetera, on what sorts of claims are ones as to which someone can state a due process problem with financial obstacles stating the claim and what sort of claims are ones as to which the financial obstacle doesn't rise to the constitutional level. And MLB tells us in criminal cases, that's one thing. In civil cases, there are some narrow situations in which you can state a claim based on the fact that you're required to pay before you can seek your judicial relief. But the normal rule is that in the civil context, you don't. And you're making the argument that, well, this is one of these cases in which it fits within the narrow exception to the general rule because what's at stake is citizenship. Yes, absolutely. The framework that MLB in other cases explained is that what you look to is the nature and intensity of the individual at stake and then the government's countervailing interests. And I think no one would doubt that an interest in citizenship is of fundamental importance, both generally and to Mr. Asimov specifically, who's trying to avoid deportation to Iran and potential arbitrary detention and torture in Iran, which is what he experienced last time he was there. This is my question about naturalization. So the point has to be, I think, at the end of the day, that naturalization is the sort of fundamental interest as to which it would be unconstitutional to predicate your claim on the requirement to pay. Yes. Because that's what's at stake. Now, I think outside the prison context entirely, when people apply for naturalization, they have to pay a fee. There is a fee waiver that's available under the present regulations of U.S. IRS. Is that right? That's correct. It's based on ability to pay? Yes, based on ability to pay. And that's always been there? I couldn't say it's always been there. If they're now, I trust it's been there for some time. I see my red light is on. I'm happy to keep talking about the constitutional question. Do you have any case law for the proposition that, just to follow up on Judge Srinivasan's question, that for you to succeed, you have to say that an alien has a constitutional right to pursue naturalization, right? I don't think that's quite right. No? For example, and for this side. But that's what your client is, an alien. Yes. My client is an alien. He's on the outside of citizenship. I mean, you cite Eisensteiger, but that was citizens. That was citizens. Yes. So are there any cases that say that aliens have, that there's a constitutional right for an alien to pursue naturalization? Well, if I could take a half step back, I don't think the test is whether there's a constitutional right at stake, but rather whether there's a fundamental interest at stake. And for that, I would point the Court to the Boddy case. To which case? To the Boddy case, Boddy v. Connecticut, which concerned the obligation to pay a fee in divorce proceedings. The Court didn't say, and I don't think any court or the Supreme Court has since said, at least, that there's a constitutional right to divorce, per se. What the Court pointed to were the constitutional and fundamental interests in marriage, and then moved from marriage, so people inside, to looking to out, and to say that the interest is fundamental enough and important enough to justify fee waivers in that context. Here, Mr. Osamani is outside looking in at citizenship, but there's no doubt that citizenship retains a fundamental importance for him as it would for anyone, given all the well-understood rights and benefits that go along with citizenship. All right. I'm sorry, one follow-up question on this. Go ahead. One strand of MLB, though, is that there's a difference between a consequence that's visited upon you by the State and a benefit that you seek from the State. And in the criminal context, and in the context of MLB itself, and in the context of other situations involving divestiture of parental rights, that's a consequence that's visited upon you by the State, and what the Court indicated in MLB is, well, in that situation, you have a better chance to make the argument that there's a fundamental interest at stake of the kind that would put you on the right side of the ledger from your perspective, as to the civil claims that fall within and the civil claims that fall without. But when you're seeking naturalization, that's not a consequence that's visited upon you by the State. That's a benefit that you're affirmatively seeking out. Right. I think that language is in the context of drawing the distinction that's maybe better fleshed out in the body case, in Justice Harlan's opinion, between sort of processes that are monopolized by the State and processes for which someone can, for better or worse, seek self-help. A contract dispute can be ironed out, a bankruptcy dispute from someone who says, look, I'm no longer able to make good and my ongoing obligations can go to a creditor and say, well, we accept $20 instead of $50. This process, naturalization and citizenship, is monopolized by the State in no lesser sense than either the criminal context, termination of parental rights, which was at issue in MLB. Then the other thing I would say is that one thing that Mr. Osamani is trying to avoid is he's not just seeking a benefit in the sense of gaining citizenship, but the flip side of the coin,  which is very much something that the United States government would be doing to him. Thank you. Good morning. Good morning, Your Honors. Members of the panel, and may it please the Court, my name is Winn Kelley, appearing today on behalf of the government. If I could, Your Honors, I'd like to pick up first on the thread of Judge Tatel's question. Amicus raised this in his reply brief, but as Judge Tatel noted, there is no fundamental right to citizenship for an alien, and this goes back to the Supreme Court's decision in the United States versus Ginsburg in 1917 and was reaffirmed in Federico versus United States in 1981 by the Court, where the Court said no alien has the slightest right to naturalization unless all statutory requirements complied with have been met. So Mr. Osamani's interest here takes it well outside the nature of fundamental interest. Just based on that language alone, I take it that their argument would be that the whole issue is whether the statutory requirements have been met, and their claim is, I assume, that the statutory requirements have been met, and I just want an opportunity to be able to make that argument. Well, and that possibly would get to the merits, which this case is in an interesting posture in that we are only at the three-strike stage and we have not even gotten into the 12B1, 12B6 arguments. The government would have, as we noted in our brief in footnote two, this issue has been raised before by Mr. Osamani, the specific issue that Your Honor raised, and the district court in Maryland, affirmed by the Fourth Circuit, found that he had not met the statutory requirements and that he had no grounds to seek naturalization. This has been an ongoing process where Mr. Osamani has sought to challenge the USCIS's denial of his petition in this court and in other courts based on his interpretation of Judge Bace of the district courts allowing him to proceed as a U.S. national for purposes of foreign sovereign immunity. So are they two different? I'm not following entirely. The other proceeding you were talking about that went to the Fourth Circuit, did that have to do with U.S. nationality or did it have to do with naturalization to become a citizen? It had to do with naturalization. It had to do with Mr. Osamani seeking review of the denial of his naturalization. And that's Osamani v. Napolitano, the 2010 case. And again, the reason why it's not, and I apologize to the court, but perhaps the reason why it's not as evident in the record as it normally would be is because the issue in the district court was merely that Mr. Osamani should not be allowed to proceed at all without full prepayment of his filing fee. And so that gets to the first issue, which is that Mr. Osamani failed to either timely or adequately plead the imminent danger exception to the statutory bar, which, as both Mr. Osamani and amicus have acknowledged, he concedes he has exceeded the three-strike bar. Mr. Osamani's allegations of imminent danger, first, were not raised in either his petition or his motion for informal pauper status. And second, the content of them is almost identical to the ones this court has found wanting in both Mitchell and Pinson. Judge Srinivasan discussed Pinson. Mr. Pinson made additional allegations that were even more similar to Mr. Osamani's here in that Mr. Pinson stated that he was a former member of a gang and that the special management unit at the Talladega FCI, where he was housed, contained rival gang members who were threatening to kill him. Similar to Mr. Mitchell, Mr. Mitchell claimed that his housing location was known as one that was threatening to snitches. These exceed the allegations that Mr. Osamani has made here. Mr. Osamani has made allegations of assaults over a year before, so there's a temporal issue. There's been a change in his housing status, and any allegations of ongoing harm are the same nebulous, general, there is a vague threat out here that this court has found wanting in both Mitchell and Pinson. And again, this court... So there is the allegation in the response, and I'm looking at JA-43. There's two sets of allegations to see relevant. One is the appendix 41, where he says that even under protective custody status, he's faced with a constant threat of violence because of the maximum security nature of other inmates' constrictions, a great many of whom are serving life sentences. So I think that's the one that you were specifically discussing and describing as generalized, which I understand that argument. But then there's a separate point on page 43 that he has been beaten up numerous times by other maximum security inmates, and he's documented every single incident. And what is your reaction to the latter one? The latter one, again, there's no claim of an ongoing threat, and it still does not contemplate, excuse me, it still does not allege both an ongoing and actual threat, and also does not claim that the protective custody change in status has not ameliorated this concern. And there's nothing in the record that says that he is continuing to be beat up on a daily basis, which is what the type of allegation that this court looked to favorably in Ashley v. Dilworth out of the Seventh Circuit, where it was, I am continuing to be beat up constantly, and my prison custodian is intentionally putting me in the position where I am injured on a constant basis. Those allegations are not present. It doesn't have to be intentional, I take it. I don't know why that matters. No, I'm just saying those were the allegations in Dilworth and Ashley, and those are not present here. If there was an allegation of actual imminent harm, of course it would not need to be intentional. But Your Honor's comment leads to the next question, which is USCIS is not Mr. Rosselmoni's custodian, and USCIS has no ability to protect him from even these allegations of past assaults. USCIS is not the one making his custody determination. But is it not true that if he were to become nationalized, I mean this requires a series of steps obviously, and I take your point that there's going to be some questions at every step, but if he were to become nationalized, the immigration detainer gets dropped. If the immigration detainer gets dropped, then at least that one criterion by which you get put in a particularly high security status is less likely to be there. It doesn't eliminate it. You're right to say that. There's other reasons why he might warrant categorization in that category given his conduct in the past, et cetera. But it would remove one basis upon which that high classification would exist. Is that not true? It is true that it could possibly, yes, Your Honor, it would remove that four or six point category. It would in no way change automatically his classification, and there are numerous other factors that have been identified in the record. And again, as Your Honor pointed out, the Maryland State custodian, even if he were to go below, would not have to automatically transfer him to a minimum security prison. And I think that's the most important issue for the court to consider is, so even if the corporate to order this hearing before USCIS, despite another federal court finding that his petition was rightfully denied, even if he were to be successful there, and even if he were to become a citizen, and even if ICE were to remove the detainer, then the State of Maryland still would have discretion under Maryland State law, as interpreted by the Maryland Supreme Court, to determine that he needed to stay in maximum security. And that leads, Your Honor, to the government's second point, which the court asked us to brief about it, which is the nexus requirement. The nexus requirement, as the Second Circuit has applied in Pettus v. Morgenthau, is an appropriate crafting by the court to best accomplish the goals of the Prison Litigation Reform Act by ensuring that a prisoner's allegations of ongoing imminent actual harm are married up with the actual claims sought in the prisoner's petition for relief. As in Pettus, this court has a tool readily available, through the redressability prong of the constitutional standing inquiry, to apply. So why would we apply that? So let's assume that there is a nexus requirement. Then the question is, what kind of nexus standard do you impose? And I take it one goal of the PLRA is that when you have a threshold determination like this, which doesn't get to the merits, the inquiry ought to be pretty straightforward. And if you have the kind of highly contextualized redressability inquiry that attends normal standing analysis, it's not the most straightforward thing to apply in every case, whereas a straightforward standard would be if the relief you seek would take you out of dangerousness, and that relief naturally attends the claim that you're making, well, you get by imminent dangerousness. So you get out of peace status and you get to bring the claim. It doesn't mean you're going to prevail on merits. It doesn't mean any of that, but the purpose of the threshold inquiry, which is just designed to determine the financial conditions under which you go forward, we're going to apply a straightforward test that just asks whether the relief you seek for your claim, if it naturally attends your claim, would alleviate the dangerousness. In your honor, I see I've exceeded my time. May I ask your honors a question? It's up to Judge Rogers. Of course. Thank you, your honor. The nexus requirement would allow, and the government agrees with your honors' contention, that this should be a straightforward, easy analysis. But the example would be, if I may offer a hypothetical, if a prisoner says, I am in danger for my life on a constant daily basis, I need desperate help, and my claim is for a properly exhausted Freedom of Information Act to the U.S. Department of Agriculture. That type of claim, the prisoner has pled actual imminent danger, but should the prisoner be allowed to proceed on that claim under the purposes of the Prison Litigation Reform Act? We believe the statute indicates, and the case law interpreting it would indicate no. Any legislative history supporting that case law? Any legislative history? Well, there's the comments by Senator Kyle and Senator Dole about the flood of frivolous litigation. No, no, I understand. But the theory that if you were facing imminent danger, the bar is removed, and therefore you can proceed in court any way you want as distinct from this nexus requirement. That's all I was getting at. Your honor, there's nothing in the legislative history supporting the nexus requirement. It's solely based on the purpose of the statute. It's what the Second Circuit set forward. Thank you. If there are no more questions, the government would ask that the district court be affirmed. Thank you. Counsel for appellate? A couple of points which go largely to the nexus issue, which I didn't address my first time up. As to how the relief that he's seeking would bear on his claim, it's true that Maryland wouldn't automatically move him out of medium security into minimum security. What's also true is that the immigration detainer prevents his custodian from moving him to minimum security. Refer the court to the prison classification rules that are in the addendum to our opening brief. With the detainer in place, which is nine points out of the 18 that makes Mark the threshold between minimum and medium security, he's way over the mark. Without it, he's under the mark. And then the classification rules generally say that he can't be placed any lower than his classification score. So if he's above 18, he has to be in medium. If he's below, the general rule is he's supposed to be placed in the least restrictive environment amenable to him. So I think that's a clear point in his favor. As to him raising the allegations a year after he first, or he says in his opposition to the order to show cause that the attacks were a year before. But that also accounts for about a nine-month period between when he filed his complaint, which is the operative moment, and when his order to show cause response comes in. So it's actually a close in time gap between the last recorded attack noted in his pleading and his move to protective custody. As to the fundamental right point, it's equally true in body when we're talking about divorce or in MLB when we're talking about termination of parental rights that someone who doesn't qualify to get divorced or someone who doesn't qualify to keep their parental rights would lose out. That's not the nature of the inquiry. The nature of the inquiry is whether the interest is fundamental. And I don't think there's any doubt that citizenship is fundamental. We could point to Perez v. Brunel, to Johnson v. Eidenschrecker, to any number of statutes. As Johnson points out- What was the first case he said? Perez v. Brunel. That much is clear. And as to the nexus requirement, if I may offer one word, I do believe, as we said in our brief, that the Article III standing requirement is too complex and too involved for this circumstance. A test that asks whether the relief sought would advance the prisoner's interest in escaping imminent danger I think would be appropriate and adequate and easily implemented. And if there are no further questions, I would ask and thank the Court again for the appointment. Well, the Court thanks you for your assistance. Thank you. Thank you, Your Honor.
judges: Rogers, Tatel, Srinivasan